Filed 12/6/21  P. v. Carbajal CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALBERTO HERNANDEZ CARBAJAL,<br><br>Defendant and Appellant. | A161025<br><br>(Del Norte County<br>Super. Ct. No. CR-PB-19-5041) |

A riot occurred at Pelican Bay State Prison in May 2017, in which multiple correctional officers were severely injured.  Defendant was convicted of 16 counts of assault in connection with attacks on eight different officers during the riot.  He challenges his convictions on the ground that the trial court should have appointed two experts to assist with his defense.  He also contends his convictions must be reversed because (1) there was insufficient evidence supporting seven of his convictions for assault by a life prisoner by means of force likely to produce great bodily injury under Penal Code[1] section 4500; (2) defendant's eighth section 4500 conviction must be reversed because there was insufficient evidence to support the conviction on the

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

natural and probable consequences theory advocated by the prosecutor; (3) all of defendant's convictions should be reduced to convictions of riot (section 405) under the authority of *People v. Chiu* (2014) 59 Cal.4th 155; and (4) defendant was improperly convicted of violating both sections 4500 and 4501, subdivision (b) (section 4501(b)) based on the same conduct.

We conclude that the trial court did not abuse its discretion in refusing to appoint defense experts.[2]  For reasons we explain below, we determine insufficient evidence supported seven convictions of section 4500, and one of defendant's section 4501(b) convictions must be reversed because he was convicted of section 4500 on the same grounds.  In all other respects, we affirm the judgment.

## I.  BACKGROUND

### A.  *The Prison Riot*

On the morning of May 24, 2017, two inmates began punching each other in the upper head and torso on the general population yard at Pelican Bay State Prison.  When the fight began, there were approximately 300 inmates on three adjacent yards.  The yards are known as "1 Yard," "2 Yard," and "3 Yard"; the fight was taking place on 3 Yard.

Multiple correctional officers called for the two inmates to "get down."  All of the inmates went into a prone position except for the two combatants, who continued fighting.  When the combatants disobeyed orders to get down, a control booth officer fired a hard sponge round from his 40-millimeter

_____

[2] In a related petition for writ of habeas corpus (case No. A163179), defendant argues the trial court erred in denying his requests for experts necessary to his defense, trial counsel provided ineffective assistance, and he was convicted based on false evidence.  We deny the petition today by separate order.

launcher striking one of the inmates in the back thigh. Officers fired oleoresin capsicum pepper spray (O.C. pepper spray or pepper spray) grenades near the two fighting inmates, and then struck them on the legs, buttocks, and shoulders with batons while repeating orders to "get down." When those efforts failed to stop the fight, officers intervened to pull the two inmates apart.

As the correctional officers tried to pull the two fighting inmates apart, somewhere between 20 to 75 inmates got up from the prone position on 1 Yard and started running toward the fight on 3 Yard. Another 25 to 35 inmates on 2 Yard also got up and started running in the same direction toward the vehicle gate connecting the yards. At this point, officers attempted to close the vehicle gate. As they were trying to close the gate, inmates on 3 Yard also jumped up, rushed toward the officers, and began attacking them.

Inmates began swarming through the gates from the other two yards. The inmates ignored commands that were given by officers both on the ground and over the public address system to "get down." The officers on 3 Yard defended themselves but were overwhelmed by the vastly superior number of inmates.

Armed officers in observation posts tried to end the riot by firing shots from the towers. Officers Hendrix and Gonzalez fired warning shots, but the inmates continued fighting. Officer Hendrix shot an inmate near a correctional officer who was pinned against the fence by the mob. The inmate fell to the ground and other inmates left the area. Hendrix did not feel he could take any more shots, however, because he did not have a clear shot and did not want to hit an officer.

Officers issued a "Code 3" call which required the assistance of all available officers at the institution. As more staff started to arrive, the rioting inmates began to get down, prone to the ground. Additional officers arrived and formed a scrimmage line to put an end to the riot. Medical staff arrived to assist injured correctional officers and inmates. The inmates were handcuffed and then removed from the yard.

Eight correctional officers were attacked, including Officer McCully. All of the correctional officers who were attacked were injured. Five officers were severely beaten and suffered permanent, disabling injuries. Those five officers were unable to continue their jobs and had to retire early due to their injuries.

## B. Defendant's Role in the Riot

Officer McCully was working in "Building 5" on the morning of the riot. He heard an order to "get down" come over the yard public address system. As he left the building, McCully heard the "pop" of a blast grenade containing O.C. powder, and as he came out the door, he saw white powder trace and two inmates going to the ground fighting.

As the inmates remained locked in their fight, McCully heard an officer say to pull them apart. McCully was pulling on gloves to assist in handcuffing and escorting the combatants when he saw "a large majority" of inmates on the 2 Yard stand up and start running toward them. The inmates were progressing "like a wave." McCully heard someone yell, " 'Get the gate,' " and he saw officers run to try to close the gate. McCully attempted to assist with securing the gate, but never got close enough because inmates started to pile up and pull the gate open. McCully then pulled out his O.C. pepper spray and tried to spray the face of every inmate coming through the

4

gate but it was ineffective, and inmates ran right through it. Events became a blur for him for a minute.

Officer McCully's next clear memory was of fighting defendant on the handball court. Defendant was coming at McCully and had his hands by his face in fists. He tried to punch McCully with his left hand. McCully had his O.C. pepper spray in his left hand and his baton in his right. McCully fired his pepper spray in defendant's face.[3] As defendant tried to punch McCully, McCully leaned back and swung his baton, aiming for defendant's left arm. McCully felt his baton strike defendant but he was not sure exactly where it struck. At that point, McCully heard someone yell, " 'Officer down.' " McCully forgot about defendant and went to assist Officer Hicks who appeared to be unconscious.

As McCully was trying to figure out how to help Hicks, he saw Sergeant Mount being swarmed by inmates along the fence separating 2 Yard and 3 Yard. Inmates rushed at McCully, punching him in the head and upper torso. He tried to use his baton to keep them off of him, but his feet were kicked out from underneath him and he went to the ground. He got back up and was able to push his way out of the mass of inmates with his pepper spray and strength and make his way off the yard with other officers. McCully was given a medical evaluation, his injuries were photographed for evidence, and he was then taken to the hospital.

### C. Identification of Defendant

The next day, investigators came to McCully's home to take additional photographs of his injuries. McCully asked them if they had an unlabeled photo lineup. They said they did not.

---

[3] McCully said he didn't know if the spray actually hit defendant or how much spray came out.

When he returned to work nine weeks later, investigators had put together a binder with 22 pages of inmate photos without names. McCully looked through the binder and identified defendant and several other inmates. The photograph of defendant appeared to be an old photo. McCully recognized the face, but said the photo was not a good representation of what defendant looked like on the day of the incident. McCully pointed at the photo and said, " 'I hit him with a baton, but he had a bald head and a mustache.' "

McCully also saw photos of inmates against fences, and he picked defendant out in one of those photographs. In that photograph, defendant was bald and had a mustache. At trial, McCully again identified defendant as the inmate who attacked him on the handball court.

Inmates who participated in the riot were both videotaped and photographed. The officer who videotaped inmates made notes about where each inmate was found at the end of the riot and matched them with their photo in the computer system. She discovered defendant was found in an area that was considered "out of bounds," meaning inmates were prohibited from being there.

Another officer took photos of defendant and an injury to his shoulder. The injury was a welt about five inches long and a quarter-inch wide that appeared to be the result of a baton strike on the upper back between the shoulder and the shoulder blade. Defendant also had red marks on his back that appeared fresh. Defendant had marks on his pants leg and waistband. Based on his experience, the officer believed the marks were either blood or pepper spray. Defendant's t-shirt was on his left wrist in the photo.[4]

---

[4] McCully could not recall whether defendant was wearing a shirt or how he was dressed when they fought on the handball court.

The defense introduced defendant's medical records. They show he was not exposed to pepper spray on the day of the riot.

The parties stipulated that defendant was a life prisoner at the time of the riot.

## D. Charges Against Defendant

On July 27, 2020, the Del Norte County District Attorney filed an amended information charging defendant with eight counts of assault by a state prisoner by means of force likely to produce great bodily injury (§ 4501(b): counts 1–8) against eight different correctional officers, and eight counts of assault by a life prisoner with force likely to produce great bodily injury (§ 4500; counts 9–16) against the same eight correctional officers. The information further alleged that defendant had previously been convicted of murder (§ 187), a serious or violent felony (§§ 667, subd. (a), 1192.7) and a strike offense (§ 667, subds. (b)–(i)). Defendant admitted the prior conviction allegations.

## E. Conviction and Sentencing

The jury convicted defendant on all 16 counts. The trial court denied defendant's motion to dismiss the prior conviction allegations and sentenced defendant to a term of 59 years to life, consecutive to the sentence defendant was already serving. The sentence was comprised of three consecutive terms of nine years to life on counts 9, 10, and 11, doubled based on the prior strike offense, plus five years for the prior serious felony enhancement. The court imposed concurrent terms on the remaining convictions for assault by a life prisoner (§ 4500) and stayed the sentences pursuant to section 654 on eight counts of assault by a state prisoner (§ 4501(b)).

## II. DISCUSSION

Defendant raises several claims of error.

## A. Defense Experts

Defendant first claims that the trial court violated his statutory and constitutional rights to prepare a defense and to a fair trial by refusing to allow him to call experts on corrections and the effects of O.C. pepper spray. " 'An indigent defendant has a statutory and constitutional right to ancillary services reasonably necessary to prepare a defense. [Citations.] The defendant has the burden of demonstrating the need for the requested services. [Citation.] The trial court should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1255, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; Evid. Code, § 730 [trial court may appoint expert "at any time before or during the trial of an action" when it appears "expert evidence is or may be required . . . by any party to the action"].) We review the trial court's refusal to appoint defense experts for abuse of discretion. (*Hajek and Vo*, at p. 1255; *People v. Garcia* (2016) 5 Cal.App.5th 640, 655.)

### 1. Daniel Vasquez

#### a. Additional Background

At a trial setting conference on June 4, 2020, the trial court confirmed the July 27 trial date and ordered that pretrial motions be filed by July 2 to be heard on July 9. On July 2, defendant filed an ex parte motion for the appointment of Daniel Vasquez, a correctional expert, "to advise the defense on a confidential basis, assist in the investigation of this case and to testify at trial on the grounds that the appointment is necessary to properly prepare for the trial in this matter." Defense counsel asserted Vasquez's testimony was "necessary to advise counsel [and] assist in the investigation of the case

8

against . . . the Defendant, including but not limited to testifying in Court about prison gangs, prison culture, and use of force limitations at Pelican Bay State Prison." Defense counsel argued the expert would assist in the presentation of the defense case and in preparing for effective cross-examination of the prosecution's witnesses.

Counsel's declaration accompanying the motion stated Vasquez was a former warden of San Quentin prison, was "well versed in prison gang rules and culture, [California Department of Corrections and Rehabilitation] rules and expectations regarding correctional officers, and inmate behavior expectations during riots." The declaration also stated counsel was prepared to show defendant's need for an expert at an in camera hearing if the court required more detail. Counsel stated Vasquez's assistance was "essential to a vigorous and competent preparation of the defense" and that defendant could not receive "a constitutionally adequate defense" without it.

At the July 9 hearing, the trial court confirmed the July 27 trial date. Defense counsel mentioned the ex parte motion for appointment of Vasquez. The trial court responded: "I do have one pending for you. And I can tell you secretly that I'm going to deny it." Counsel inquired whether he would have "an opportunity for an ex-parte or in-chambers conference" on the motion. The court stated, "I don't know how we could do that between now and the 27th given [our] schedule[s]." Trial began on July 28 without any further consideration of Vasquez's appointment as an expert.

On the fourth day of trial, August 3, defense counsel renewed his request that Vasquez be appointed as an expert. Counsel stated he needed an expert to explain how a one-on-one fight should have been handled and how it would be anticipated that inmates would react. The trial judge remarked that it "looks like everybody should have just laid down and that

9

would have been the end of it." The court refused to appoint Vasquez, saying it did not see how an expert, especially the one proposed based on the matters set forth in the declaration, was "essential to this case."

The next day, after ruling on a different motion, the trial court briefly discussed defendant's motion for a corrections expert. The judge stated that although he did not know when defendant "actually made" his motion for an expert, the judge was not aware of the motion until three days before jury selection. As a result, the court observed, the motion was "late" which created "discovery problems."

### b. Analysis

Defendant argues the trial court erred by unreasonably declining to allow defense counsel to explain the need for a prison expert at an ex parte, in camera hearing, and contends he should not have been required to reveal his defense strategy in open court. We need not address this contention, however, because we conclude even if the trial court erred in refusing to consider the motion or appoint an expert, the error was harmless under any standard of review.[5] (See *People v. Watson* (1956) 46 Cal.2d 818; *Chapman v. California* (1967) 386 U.S. 18.)

Defendant contends he needed a corrections expert because in order to be found guilty as either a direct perpetrator or aider and abettor of the riot, he must have intended to commit, encourage, or facilitate the commission of a riot. (See *People v. Gomez* (2018) 6 Cal.5th 243, 279.) If defendant merely *feigned* participation in the riot, he would not have had the requisite intent to be guilty of participating in a riot.

---

[5] We likewise do not consider the Attorney General's argument that defendant is precluded from raising this issue on appeal because he argued a different reason for needing Vasquez's testimony at trial.

10

Defendant asserts the testimony at trial supported such a theory because officers testified that (1) northern Hispanic gang members on the yard stood up and then got back down, (2) there were a lot of Hispanics on the yard with bald heads during the riot, and (3) not all inmates who got up and ran in the direction of the officers had attacked.  Defendant contends he could not *prove* his defense, however, without expert evidence that southern Hispanic gang rules required participation in the riot and that southern Hispanic inmates therefore feigned participation or may have run with other inmates in order to avoid being trampled or beaten.

Here, the failure to allow expert evidence that inmates *might* have feigned participation in order to avoid discipline by the gang was harmless because the evidence showed that defendant *did* participate in the riot. Officer McCully testified he had a clear memory of fighting with defendant. Defendant approached McCully with his hands up in fists and tried to punch him in the face.  McCully swung his baton at defendant and felt the strike impact of his baton, but he was not sure where he hit defendant.  After the riot, defendant was found in the area of the prison yard that was "out of bounds," meaning he was in an area where inmates were not allowed. Photographs of defendant from just after the riot show defendant had a welt on his back that was about five inches long and a quarter-inch wide that appeared to be caused by a baton strike.  Defendant also had red marks on his back that appeared fresh.  Defendant speculates his injuries could have been caused when he dropped to the ground with his shirt off or by shrapnel from fired bullets, but he points to no *evidence* supporting such a theory.[6] On

---

[6] Defendant notes Officer Contreras, who photographed injuries on defendant after the riot, "speculated" that defendant's injuries could have been inflicted by shrapnel, but he disavowed any expertise on the subject.

11

this record, we conclude the exclusion of expert evidence that inmates may feign participation in a riot to satisfy their gang obligations was harmless beyond a reasonable doubt because the evidence showed defendant was an active participant in the riot.

### 2. *Dr. Allen*

#### a. Additional Background

During the prosecution's direct examination of Christopher Corpstein, a correctional sergeant, defense counsel requested a bench conference. Corpstein had just testified that inmates occasionally have very little reaction to O.C. pepper spray. Whether the spray has an effect on an inmate can depend on a variety of factors, such as wind direction and the part of the inmate's body that is sprayed. He also testified that an inmate can decontaminate from O.C. pepper spray with "fresh air," but an objection to that testimony was sustained as leading.

During the bench conference, defense counsel told the court he needed to know whether he was going to be able to have a medical expert testify on O.C. pepper spray, because it was "a crucial part of my defense whether my client was suffering from the effects of O.C." Defense counsel explained McCully had testified that he sprayed defendant in the face with O.C. pepper spray, but if it was shown defendant was *not* sprayed with O.C. pepper spray, it would "eliminate his identification" of defendant as the inmate who assaulted him. Counsel said an expert could make that determination from a photograph.

---

But " '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

The prosecutor objected to the late disclosure and argued if the defense called Dr. Allen as a witness, the prosecution would be "calling some other officers who are more expert in O.C." The court concluded the conference by saying, "For right now, just keep examining . . . the witnesses." After Corpstein's testimony, the court invited the parties to make an offer of proof as to why the defense needed expert testimony.

Defense counsel explained he needed Dr. Allen's testimony because the medical records nurse who treated defendant was no longer with the prison and was unavailable to put on the medical record indicating defendant was not sprayed. Defense counsel argued that the testimony was crucial to the argument that his client was misidentified. The prosecution again objected to the late disclosure. When the trial court asked defense counsel why he did not propose Dr. Allen's testimony sooner, counsel responded that it was a question of his "diligence." He had previously failed to see the medical record stating defendant was not sprayed among several thousand discovery documents.

The trial court allowed the defense to enter the medical record as a business record. Defense counsel said, "If I could submit that, that would be great." The trial court then stated, "That takes care of that problem."

The trial court ruled it was not going to allow defendant to call Dr. Allen "because that just defeats the whole discovery statute." The court also stated that it was excluding Dr. Allen's testimony under Evidence Code section 352. The court mentioned it would take time for the doctor to prepare a report and for the prosecutor "to depose him." The court also stated that the prosecution theory did not require eyewitness identification because defendant could be guilty of the assaults under the natural and probable consequences doctrine by aiding and abetting the riot.

13

### b. Analysis

Defendant argues he established the need for appointment of Dr. Allen and the trial court's refusal to appoint him was an abuse of discretion. Defendant contends "[t]rial counsel's mention of the officers' testimony that some people are not affected by O.C. suggests that Dr. Allen would have testified that is not true."[7]  If defendant were able to establish that he was not sprayed with O.C., that would be substantial proof McCully had misidentified him.  Accordingly, defendant argues, Dr. Allen's testimony was critical to his defense.

We are not persuaded.  First, defendant did not argue to the court or submit a report from Dr. Allen showing he would testify that the testimony that some people are not affected by O.C. pepper spray was false.  Moreover, defendant's proposed testimony from Dr. Allen that defendant was not sprayed with O.C. pepper spray would have been cumulative in light of his medical records showing he was not sprayed and likely would have required substantial additional time for both Dr. Allen's testimony and rebuttal witnesses.  On this record, we cannot say the trial court abused its discretion.

In any event, any error in refusing to appoint Dr. Allen was harmless. The trial court allowed defendant's medical records into evidence indicating that he had no O.C. pepper spray exposure.  In closing, defense counsel specifically argued to the jury that the nurse had recorded defendant's lack of exposure to O.C. pepper spray immediately following the riot, meaning that

---

[7] In his opening brief on appeal, defendant notes that in addition to Officer Corpstein, McCully, two other correctional officers, and a correctional counselor specialist gave similar testimony.

14

"Mr. Carbajal was not sprayed. And he never confronted Mr. McCully."[8] The jury nonetheless rejected defendant's version of events. McCully positively identified defendant in a binder containing 22 pages of unnamed inmate photographs, among photographs of inmates taken immediately after the riot, as well as in court. Defendant also had fresh injuries on his back consistent with McCully's testimony that his baton struck defendant. In light of the strong evidence that defendant participated in the riot by assaulting McCully, defendant was not prejudiced by the trial court's refusal to allow Dr. Allen to testify.

### c. Ineffective Assistance of Counsel

Defendant also advances an argument that he was denied effective assistance of counsel when his trial attorney failed to timely disclose Dr. Allen to the prosecution as an expert witness.

To succeed on an ineffective assistance of counsel claim, a defendant must show (1) counsel provided representation that fell below an objective standard of reasonableness under prevailing professional norms and (2) prejudice resulted from counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 691–692; *People v. Jennings* (1991) 53 Cal.3d 334, 357.) A defendant shows prejudice when there is a reasonable probability that, but for counsel's deficient representation, the result of the proceeding would have been different. (*Jennings*, at p. 357.) " 'A reasonable

---

[8] Defendant also argues the "jury would have known that the nurse who filled out the checklist likely did so based upon what appellant had told her," and the jury would have found a physician's testimony more convincing than a self-serving statement from defendant. Defendant offers no basis for his assumption that the nurse recorded defendant's lack of O.C. exposure based solely on a statement from defendant.

probability is a probability sufficient to undermine confidence in the outcome.' " (*Ibid.*; *People v. Avena* (1996) 13 Cal.4th 394, 418.)

Even assuming defense counsel was ineffective for failing to disclose Dr. Allen as an expert witness, defendant was not prejudiced. As explained above, the trial court admitted defendant's medical records which indicated that no O.C. pepper spray had been used. On this record, expert evidence about whether it appeared from photographs that defendant had been sprayed with O.C. pepper spray would have been cumulative and given the strong evidence of defendant's assault on McCully and participation in the riot, he suffered no prejudice.

## B. Sufficiency of the Evidence

Defendant next contends the evidence is insufficient to sustain all but one of his convictions for violation of section 4500. The Attorney General concedes this point. We agree.

To find an individual guilty of violating section 4500, the jury must find that person has been sentenced to a maximum term of life in state prison in California. (§ 4500.) It is undisputed that defendant was a life prisoner at the time of the offense and McCully testified defendant assaulted him. Therefore, the evidence was sufficient to support defendant's conviction on count 15 for assault by a life prisoner on McCully based on the theory that defendant committed that offense as a direct perpetrator.

However, there was no evidence that defendant assaulted any other officer. As to the other seven officers, the prosecution argued defendant was guilty of assault by a life prisoner under the natural and probable consequences doctrine based on the theory defendant was guilty of the target crime of participating in a riot and the assaults on other officers were a natural and probable consequence of that act. The prosecutor argued to the

jury that she must prove that "the natural and probable consequence of that riot was that some assaults would occur by a *life prisoner* on staff that day." (Italics added.) The jury was instructed under the natural and probable consequences doctrine with CALCRIM No. 403 that the prosecution must prove that "[d]uring the commission of riot a *coparticipant* in that riot committed the crime of . . . Assault by Life prisoner."[9] (Italics added.)

No evidence was presented that any of the other inmates who committed the assaults against officers other than McCully were serving a life sentence at the time of the riot. Accordingly, the evidence was insufficient to support defendant's convictions on counts 9 to 14 and 16, and those convictions must be reversed.

## C. Count 15—Assault by Life Prisoner As to Officer McCully

Although defendant concedes there is sufficient evidence to support defendant's conviction on count 15 based on evidence that he assaulted McCully, defendant contends we must nonetheless reverse his conviction on that count because that was not the prosecution's theory of the case in the trial court. Rather, defendant argues, the prosecution repeatedly told the jury defendant was guilty because he aided and abetted a riot and the assaults which took place were a natural and probable consequence of that act.

As defendant acknowledges, generally evidence is sufficient to support a criminal conviction when it would enable a rational trier of fact to find that the essential elements of the crime have been proven beyond a reasonable doubt. (*People v. Rowland* (1992) 4 Cal.4th 238, 269.) A jury is fully equipped to determine when proof is factually inadequate. Thus, reversal is

---

[9] Defendant does not raise any challenges to the jury instructions given at trial.

17

not ordinarily required when the jury has been presented with two theories of guilt and only one of those theories has adequate factual support. (*Griffin v. United States* (1991) 502 U.S. 46, 59–60; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

However, defendant argues, when the record shows that the jury did in fact rely on the unsupported factual theory of conviction, reversal is required. (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1129.) In *Guiton*, our Supreme Court offered a hypothetical example of prejudice from an invalid factual theory where "the district attorney stressed only the invalid ground in the jury argument, and the jury asked the court questions during deliberations directed solely to the invalid ground." (*Ibid.*) In such a case, the court noted, "we might well find prejudice. The prejudice would not be assumed, but affirmatively demonstrated." (*Ibid.*) Defendant argues that was the case here because in her argument to the jury, the prosecutor stressed only the theory that defendant aided and abetted the riot.

We reject defendant's argument. First, the record does not reveal that the jury asked any questions, let alone only questions directed solely to the invalid factual ground. More importantly, the prosecution did not rely exclusively on the invalid factual theory in closing argument. While it is true the district attorney argued the aiding and abetting theory of liability as to all counts, it was not the only theory argued. In her closing statement, the prosecutor said, "McCully was . . . assaulted with force likely to cause GBI [(great bodily injury)]. And this is where I think *you can find the defendant guilty directly of that because he assaulted McCully*. He ran at him. He swung at him. And that swing was likely to cause GBI to him. That fist to the head would have caused GBI. It would have continued. They could have gone down on the ground. It's force likely to cause GBI." (Italics added.)

18

Throughout her closing statement, the prosecutor repeatedly argued that defendant assaulted McCully. The parties stipulated that defendant was a life prisoner. The jury had all of the evidence it needed to convict defendant of assault of McCully by a life prisoner and the prosecution argued the theory he directly assaulted McCully to the jury. Because the record does not reveal that the jury found defendant guilty of assaulting McCully *solely* on the invalid theory that he aided and abetted other life prisoners, we affirm his conviction on count 15.

### D. People v. Chiu

Defendant next contends that all of his convictions should be reduced to convictions of riot (§ 405) under the rationale of *People v. Chiu, supra*, 59 Cal.4th 155 (*Chiu*), superseded by statute on other grounds as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, footnote 3. In *Chiu*, the defendant was found guilty of first degree murder as an aider and abettor. The jury was instructed on two alternative theories: that the defendant directly aided and abetted the murder, or that he aided and abetted either an assault or disturbing the peace, the natural and probable consequence of which was murder. (*Chiu*, at p. 158.) Our Supreme Court held a defendant may not be convicted of first degree murder under the natural and probable consequences doctrine. (*Id.* at pp. 158–159.)

Defendant contends the rationale of *Chiu* applies here and argues the connection between the culpability of a defendant who aids and abets a riot is too attenuated to impose aider and abettor liability under the natural and probable consequences doctrine for assault by a state prisoner (§ 4501(b)) or assault by a life prisoner (§ 4500). Further, defendant argues, the offense of assault by a life prisoner under section 4500 requires malice aforethought. Because that requires either an intent to kill or a conscious disregard for life,

defendant argues it is a uniquely subjective and personal mental state that an aider and abettor of a riot does not necessarily share with the direct perpetrator of an assault by a state or life prisoner. Finally, defendant contends that the punishment for assault crimes is not commensurate with an aider and abettor's liability, noting that the maximum punishment for participation in a riot is one year in county jail and a $1,000 fine (§ 405), while the punishment for assault by a state prisoner by means of force likely to produce great bodily injury is imprisonment in state prison for two, four, or six years, to be served consecutively (§ 4501(b)), and the punishment for assault by a life prisoner by means of force likely to produce great bodily injury where the victim does not die within a year and one day is nine years to life (§ 4500). The disparity in these punishments suggests that the culpability of one who participates in a riot is not commensurate with the culpability of one who actually commits such an assault.

As an initial matter, we need not consider this argument with respect to defendant's section 4500 convictions, because we have already determined that the seven convictions based on the natural and probable consequences doctrine must be reversed for insufficient evidence, and his conviction on count 15 can be upheld on evidence he directly assaulted McCully. As to counts 1 through 8, we reject defendant's argument that *Chiu* supports reduction of his convictions to riot.

In *Chiu,* our Supreme Court limited its holding to the issues surrounding premeditated first degree murder. (*Chiu, supra,* 59 Cal.4th at pp. 158–159, 166–167.) Defendant cites no authority applying *Chiu* to offenses other than first degree murder. Indeed, in *People v. Flores* (2016) 2 Cal.App.5th 855, 869, the appellate court rejected the extension of *Chiu* to limit liability for torture under the natural and probable consequences

20

doctrine.  The *Flores* court explained that "the crime of torture is akin to the crime of second degree murder and imposes punishment when the perpetrator causes a harm and has a specific mental state.  Moreover, torture is not divided into degrees in which a uniquely subjective or personal intent element elevates the punishment above that imposed for a lesser form of torture.  Finally, the public policy concerns discussed in *Chiu* are satisfied if Flores is held culpable (as an aider and abettor for [the codefendant's] conduct under the natural and probable consequences doctrine, because he aided and abetted the target offense of felony child abuse and facilitated escalation of that conduct into the nontarget offense."  (*Flores*, at p. 870.)

Here, the crime of assault by a state prisoner imposes punishment when the perpetrator commits an assault with force likely to produce great bodily injury.  Assault by a state prisoner under section 4501(b) is not divided into degrees with a uniquely subjective or personal intent element that elevates the punishment above that imposed for a lesser form of assault.  Moreover, holding defendant liable as an aider and abettor for a principal's conduct under the natural and probable consequences doctrine is appropriate because it was reasonably foreseeable that defendant's participation in the riot would result in the assaults by other prisoners.  (See *People v. Smith* (2014) 60 Cal.4th 603, 611 [liability of an aider and abettor is imposed under the natural and probable consequences doctrine if " ' " 'a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted' " ' "].)  Accordingly, we reject defendant's invitation to extend the rationale of *Chiu* to invalidate his convictions for assault by a state prisoner.

### E. Prohibition on Multiple Convictions

Defendant asserts he was improperly convicted of both assault by a life prisoner under section 4500 and assault by a state prisoner under section 4501(b) for the same conduct against the same victims. He argues (1) because section 4501(b) is a lesser included offense of section 4500, his convictions under both statutes violated the rule prohibiting multiple convictions for necessarily included offenses; and (2) dual convictions were prohibited by the rule set forth in *In re Williamson* (1954) 43 Cal.2d 651 (*Williamson*) that if a general statute covers the same conduct as a special statute, the court infers the Legislature intended conduct to be prosecuted exclusively under the special statute.

Regarding count 15 (assault by a life prisoner on McCully), the Attorney General appropriately concedes that defendant cannot be convicted of both sections 4500 and 4501(b). As explained above, defendant properly was convicted of section 4500 based on a theory he directly assaulted McCully, and it is undisputed he was serving a life sentence at the time of the assault. Section 4501(b) provides, in pertinent part, "*Except as provided in Section 4500*, every person confined in the state prison of this state who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be guilty of a felony . . . ." (Italics added.) Because the express language of the statute provides section 4501(b) applies *except where section 4500 applies*, and defendant was properly convicted of assaulting McCully under section 4500, section 4501(b) cannot apply by its own terms.

As to the assault counts regarding the seven officers other than McCully, we have already determined defendant's section 4500 convictions (counts 9 to 14 and 16) are invalid for insufficient evidence. Defendant could

22

not be convicted of violations of section 4500 as to officers other than McCully because he did not directly assault any of them, and under the prosecution's natural and probable consequences theory, no evidence was presented that any of the other prisoners who committed assaults were serving a life sentence. Because these section 4500 convictions cannot stand, we need not consider whether a violation of section 4501(b) is a lesser included offense of section 4500 or whether defendant's section 4501(b) convictions are precluded by the rule prohibiting multiple convictions for necessarily included offenses.

Defendant also contends that dual convictions for violations of sections 4500 and 4501(b) are barred by the "*Williamson* rule" that "if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86; *Williamson, supra*, 43 Cal.2d at p. 654.) Because we have already determined defendant's section 4500 convictions for assault on officers other than McCully cannot stand, however, we need not consider the argument that the section 4501 convictions are barred because section 4500 is the more specific statute applicable to this case.

In sum, because we have concluded defendant's conviction for section 4501(b) against McCully and his seven convictions of section 4500 against the other officers must be reversed, there are no dual convictions for the same conduct.

### III. DISPOSITION

The judgment is reversed as to counts 9–14 and 16. The matter is remanded to the trial court for resentencing. In all other respects, the judgment is affirmed.

23

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A161025
*People v. Carbajal*